**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff/Respondent,** | ) | |
| **v.** | ) | **Case No. 02-40157-JAR** |
| | ) | **10-4026-JAR** |
| | ) | |
| **DEAN MILTON DORMER,** | ) | |
| | ) | |
| **Defendant/Petitioner.** | ) | |
| _____ | ) | |

<u>**MEMORANDUM AND ORDER**</u>

This matter is before the Court on petitioner Dean Milton Dormer's Motion under 28

U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Doc.

951).  In his motion, Dormer seeks relief on the grounds that he was denied effective assistance

of counsel because his attorney unnecessarily cross-examined a witness and failed to renew a

motion a sever.  The government responded to the motion (Doc. 968) and Dormer filed a reply

(Doc. 970).[1]  After a careful review of the record and the arguments presented, the Court denies

Dormer's § 2255 motion without further evidentiary hearing.

**I.     Legal Standards**

Under § 2255(a):

> A prisoner in custody under sentence of a court established by Act
> of Congress claiming the right to be released upon the ground that
> the sentence was imposed in violation of the Constitution or laws
> of the United States, or that the court was without jurisdiction to

---

[1]Although, Dormer's initial motion was filed *pro se*, the memorandum in support of the motion (Doc. 964)
and the reply (Doc. 970) were filed by counsel.

impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

According to Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts:

The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion. . . .

An evidentiary hearing must be held on a § 2255 motion "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."[2] Petitioner must allege facts which, if proven, would warrant relief from his conviction or sentence.[3] An evidentiary hearing is not necessary where the factual allegations in a § 2255 motion are contradicted by the record, inherently incredible, or when they are conclusions rather than statements of fact.[4]

## II.    Background

Because of the number of defendants charged in the case and the expansive nature of the evidence of conviction, a review of the underlying facts and background of the case and trial is informative.

---

[2]28 U.S.C. § 2255(b)

[3]*See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996).

[4]*Arredondo v. United States,* 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)); *see also Hatch*, 58 F.3d at 1471 ("the allegations must be specific and particularized, not general or conclusory"); *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims which are merely conclusory in nature and without supporting factual averments).

*Procedural History*

On April 20, 2005, the Topeka, Kansas grand jury returned a five-count Third Superseding Indictment, which charged Dormer in Count One with conspiring with each of the ten named co-defendants, and with others, to distribute controlled substances, including but not limited to more than 1,000 kilograms of marijuana and more than five kilograms of cocaine, beginning sometime prior to January 18, 1994, and continuing to November 5, 2003, in violation of 21 U.S.C. § 846.[5]  Counts Two through Four did not pertain to Dormer, but he was named in Count Five, which charged criminal forfeiture of assets attributable to the conspiratorial organization.[6]

Dormer was represented throughout the trial and sentencing by Michael M. Jackson. Prior to trial, Jackson filed a motion to sever Dormer's trial from that of co-defendant Hamilton,[7] which the Court denied without prejudice.[8]   Dormer's attorney never renewed his motion to sever.  Starting October 25, 2005, this Court conducted a jury trial in Topeka, Kansas, where Dormer was tried jointly with co-defendant Clive Hamilton.[9]  The jury returned a verdict of guilty as to both defendants on November 9, 2005.[10]  In addition to finding Dormer guilty of conspiring to distribute marijuana, the jury determined beyond a reasonable doubt that he

---

[5](Doc. 264.)

[6]*Id.*

[7](Doc. 309.)

[8](Doc. 680 at 34.)

[9](Docs. 470-481.)

[10](Docs. 482, 483.)

conspired to distribute "100 kilograms or more but less than 1,000 kilograms" of marijuana.[11]
On August 14, 2006, this Court sentenced Dormer to 151 months' incarceration for this
offense.[12]  Co-defendant Hamilton was subsequently sentenced to 360 months' imprisonment.[13]

Dormer filed a direct appeal to the United States Court of Appeals for the Tenth Circuit.
The Tenth Circuit affirmed both his conviction and sentence on November 21, 2008.[14]  Dormer
filed a petition for writ of certiorari with the United States Supreme Court, which was denied on
March 23, 2009.[15]  Dormer timely filed this instant motion on March 22, 2010.

### *Facts Presented at Trial*

On December 23, 2002, DEA agents received a tip about a suspicious charter flight that
was going to refuel in Salina, Kansas, at around 4:30 a.m.[16]  Agents met the flight and found
thirteen bales of marijuana stored in the luggage and boxes in the aircraft.[17]  Each bale weighed
45-50 pounds.[18]  The two passengers on the aircraft were co-defendants Troy Barker and
Ondreya Bruce, and agents arrested them for possession with intent to distribute marijuana.[19]

---

[11]*Id.*

[12](Doc. 633.)

[13](Doc. 745.)

[14]*United States v. Dormer*, No. 06-3310 (10th Cir. Nov. 21, 2008).

[15](Doc 863.)

[16]Tr. Jury Trial at 101-02.  The trial transcript consists of eleven volumes, designated as Documents 685-695, which together consist of sequentially paginated pages numbered 42-1743.  The Court refers to these documents collectively with a corresponding page reference.

[17]*Id.* at 121-28, 134.

[18]*Id.* at 128.

[19]*Id.* at 149.

The following day, December 24, 2002, Dormer called the Los Angeles Police Department ("LAPD") and reported to Officer Jason Blakely that his vehicle, a Cadillac Escalade, had been stolen.[20]  Dormer reported that his vehicle was stolen sometime between 6:00 p.m. and 6:30 p.m. on December 23, 2002, from a location in Los Angeles.[21]  Officer Blakely's report reflects that the last driver of the vehicle, Cherise Walton, left the vehicle unlocked and upon returning to it the vehicle was gone.[22]  Dormer advised that no one had permission to take the vehicle.[23]

Later that day, LAPD Officer Kenneth Boyles received a call from his dispatch, advising that the vehicle had been located and was at the Van Nuys airport in the Los Angeles metropolitan area.[24]  Officer Boyles went to this airport at approximately 7:00 p.m., where he found the vehicle.[25]  The vehicle was parked on the airport grounds behind Raytheon company, a private company that charters flights to various places around the country.[26]  This area was a secured location.[27] Another vehicle, a black Cadillac Escalade EXT, was parked next to Dormer's vehicle.[28]

---

[20]*Id*. at 830, 833-34.

[21]*Id*. at 833-34.

[22]*Id*. at 836-37, 840.

[23]*Id*. at 837.

[24]*Id*. at 845.

[25]*Id*. at 845, 847-48.

[26]*Id*. at 848.

[27]*Id*. at 851-52.

[28]*Id*. at 850-51.

At the scene, Officer Boyles spoke with a supervisor from Raytheon, who advised that four individuals had arrived in the two Cadillac Escalades and had chartered a flight to Cleveland, Ohio; and that a "Mr. Hamilton," was listed on the log as a driver of the stolen vehicle.[29] This employee advised that the chartered plane would be returning from Cleveland in a couple of hours.[30] Officer Boyles thought that this presented an opportunity to catch the individuals who had stolen the defendant's vehicle.[31] Officer Boyles then telephoned Dormer and advised him that officers had recovered his vehicle.[32] Dormer explained to Officer Boyles that his vehicle had been stolen after his wife had parked the vehicle in the Los Angeles area with the engine running, and left it for a couple of minutes to talk to a friend in a shop.[33] Dormer's wife, Cherise Walton, also spoke with Officer Boyles and repeated this story.[34] Officer Boyles advised both Dormer and Walton that he was at the Van Nuys airport and had a good chance of catching the perpetrators, that he would be back in touch with them, and terminated the call.[35]

Five to ten minutes later, an employee of Raytheon advised Officer Boyles that he had a

---

[29] *Id.* at 853-55.

[30] *Id.* at 855-56.

[31] *Id.* at 856.

[32] *Id.* at 857.

[33] *Id.*

[34] *Id.* at 860.

[35] *Id.*

phone call.[36]  Officer Boyles took the call, which was from Walton.[37]  Walton told Officer Boyles that they just wanted to come and pick up the car and were not interested in prosecuting the people who stole it.[38]  Five to ten minutes later, Walton telephoned Boyles again and explained

that she was having a business dispute with someone and did not want to prosecute, but Walton declined to reveal the name of the person.[39]

The plane landed at about 9:00 p.m. and pulled in behind the Raytheon building.[40]  The officers observed three individuals, later identified as Brian Diaz, Sean Gayle, and Clive Hamilton, disembark a Lear Jet and walk toward the Escalades.[41]  Clive Hamilton was in possession of a large stroller suitcase and walked toward the driver's side door of Dormer's Escalade.[42]

Officers contacted the three individuals as they approached the Escalades.[43]  The officers asked who was the driver of the "stolen" Escalade, and Diaz said that he was.[44]  Diaz explained to Officer Boyles that he knew Dormer, had been making payments on the vehicle for the past

---

[36]*Id*. at 862-64.

[37]*Id*.

[38]*Id*. at 863.

[39]*Id*. at 865-66.

[40]*Id*. at 871.

[41]*Id*. at 873, 875, 884.

[42]*Id*. at 873-75.

[43]*Id*. at 876.

[44]*Id*.

year, and owned it.[45]  The officers ultimately detained the three individuals, searched them, and found each of them to be in possession of firearms.[46]  The officers also searched the suitcase, which Clive Hamilton stated belonged to him,[47] and found that it contained $852,405 in United States currency.[48]

During a subsequent investigation, LAPD Detective Dennis Packer determined that the flights on December 23 and 24 were connected.  He obtained the invoice from the company that had chartered the December 24 flight that had landed at Van Nuys Airport.[49]  This invoice showed that the plane left the Van Nuys airport on December 24, went to Cleveland, Ohio, and then returned to Van Nuys on the same date.[50]  The cost of the charter was billed to "Individual Records" and "Heartless Records," both with addresses in Los Angeles.[51]  Packer learned that the President of Individual Records was Clive Hamilton, who had been stopped on the December 24 flight; and the President of Heartless records was Troy Barker, who had been stopped on the December 23 flight.[52]  In searching the Cadillac Escalade that was reported stolen by Dormer, Packer found three pay stubs to Brian Diaz from Individual Records.[53]  In Diaz's wallet, officers

---

[45]*Id.* at 904-05.

[46]*Id.* at 885-86, 940.

[47]*Id.* at 975.

[48]*Id.* at 1037.

[49]*Id.* at 1047.

[50]*Id.* at 1048-49.

[51]*Id.* at 1049.

[52]*Id.* at 1050-51.

[53]*Id.* at 1059-61.

found a piece of paper with the name "Cornel" and a corresponding phone number; this was significant to Packer because he determined that Cornell Price was an attorney representing Troy Barker.[54] He determined that the other Escalade at the scene was registered to Melanie Audato and was being driven by Clive Hamilton.[55] He also determined that Troy Barker, Brian Diaz, and Clive Hamilton were half-brothers.[56]

Brian Diaz testified that he worked for Barker from 2001 to 2002 by transporting both money and drugs.[57] He stated that Barker sold marijuana and music for a living.[58] Diaz testified that upon learning of Barker's arrest in Salina, Kansas, on December 23, 2002, he—along with Clive Hamilton and Sean Gayle—chartered the Lear Jet to Cleveland to collect outstanding monies owed to Barker.[59] They left on the morning of December 24.[60] Gayle was the person who worked with Barker in Cleveland, and knew where to go to collect the money.[61] Diaz collected this money, which was the $852,405 seized from him and the others at the Van Nuys Airport on December 24, 2002, to hire a lawyer for Barker and to bond him out of jail.[62] Diaz testified that he had been paying the note on the lease for the Cadillac Escalade, which was

---

[54]*Id*. at 1070, 1160-61.

[55]*Id*. at 1071.

[56]*Id*. at 1087.

[57]*Id*. at 1283.

[58]*Id*. at 1227.

[59]*Id*. at 1254, 1288-93.

[60]*Id*. at 1258.

[61]*Id*. at 1290.

[62]*Id*. at 1249-50, 1260-61.

registered in Dormer's name, and that he had arranged this through Dormer, whom he had met through Faeth Hamilton.[63]

Mitchell Hamilton, half-sister/full-sister to Troy Barker, Brian Diaz, Clive Hamilton, and Faeth Hamilton,[64] testified that she worked for some period of time for Faeth Hamilton as the office manager at Investor's Link Financial Service ("Investor's Link"), a realty company.[65] Investor's Link was owned by Mitchell's sister, Faeth Hamilton, who arranged fraudulent loans and real estate transactions for family members and provided false W-2 forms to facilitate these transactions.[66] Faeth Hamilton arranged a fraudulent loan for Mitchell Hamilton to purchase a $600,000 residence based on a fraudulent W-2 and other forms that Faeth Hamilton helped her obtain.[67] Faeth also arranged for other members of the family to purchase homes with fraudulent loan documents.[68]

Mitchell Hamilton testified that Faeth Hamilton and Dormer associated with each other. For example: (1) Mitchell Hamilton testified that while she worked at Investor's Link, she saw Dormer at the company;[69] (2) she drove Faeth Hamilton to Dormer's residence;[70] (3) she had

---

[63]*Id*. at 1271-73, 1294.

[64]*Id*. at 216-18.

[65]*Id*. at 348-49.

[66]*Id*. at 246-47, 251-53, 424-25, 416-17.

[67]*Id*. at 254-55, 387-92.

[68]*Id*. at 416-17.

[69]*Id*. at 315.

[70]*Id*.

seen Dormer and Faeth Hamilton have conversations;[71] (4) on at least one occasion she answered

Faeth's phone and Dormer was calling;[72] and (5) Alex Onesiuwu, a friend of Faeth Hamilton's,

obtained fraudulent loans for a living and helped Mitchell Hamilton obtain a fraudulent loan, and

Onesiuwu was a friend of Dormer's.[73]

Mitchell Hamilton also testified that on one occasion at Investor's Link she overheard

part of a conversation between Faeth Hamilton and Dormer, during which the two were

discussing "Arizona."[74]  Mitchell Hamilton testified she was aware that the high-grade marijuana

that was being trafficked by the organization came from Arizona, and was commonly referred to

as "Arizona."[75]  She also testified she knew that Faeth Hamilton had no dealings with any

business in Arizona other than being the source of the organization's marijuana.[76]

The government introduced evidence of a drug transaction involving Dormer.  Dormer

objected to the evidence as violating Fed. R. Evid. 404(b), but the Court overruled and allowed it

to be admitted as evidence of an intrinsic overt act of the charged conspiracy.[77]  Daniel Phillips,

an officer with the Charlotte-Mecklenburg Police Department in North Carolina, testified that on

April 25, 2003, he received information that a white pickup truck with two occupants had driven

past or parked in the driveway of a residence that was suspected of having received or

---

[71]*Id.*

[72]*Id.* at 316.

[73]*Id.* at 389, 426.

[74]*Id.* at 317-18.

[75]*Id.*

[76]*Id.* at 339.

[77]*Id.* at 999-1000.

anticipating the receipt of a UPS package that contained drugs.[78]  Phillips stopped the pickup and

learned that one of the occupants was Dormer.[79]  Officers searched Dormer and found a piece of

paper with telephone numbers belonging to Faeth Hamilton in his possession.[80]  Officers also

searched a trash bag that was in the back of the white pickup.[81]  Inside this bag they found four

Western Union wire transfer receipts.[82]  After piecing the receipts back together, the officers

determined that all four wire transfers had been made from Charlotte and were addressed to

Cherise Walton in California.[83]  All four wire transfers had been transmitted within a few

minutes of each other, but were sent from different locations and under different names.[84]  All of

the wire transfers were in amounts less than $1000, including two in the amount of $999.99.[85]

Phillips testified that drug traffickers commonly used Western Union to ship their drug proceeds

back and forth,[86] and that the receipts he found in this case tied Dormer to drug trafficking in

general and to the ten pounds of marijuana in particular because "this money was sent to Los

Angeles a few days before the package arrived."[87]

---

[78]*Id.* at 1379-82.

[79]*Id.* at 1385.

[80]*Id.* at 1392-93.

[81]*Id.* at 1395.

[82]*Id.* at 1396-1407.

[83]*Id.*

[84]*Id.*

[85]*Id.*

[86]*Id.* at 1394.

[87]*Id.* at 1398-99.

Officers also went to the address where the UPS package was supposed to have been sent, 1821 Hamorton Street, where they encountered Jeffrey Lewis.[88] There, they found a cardboard box in a bedroom closet with a UPS label; inside the box officers located approximately ten pounds of marijuana.[89] The return address label on the box indicated that it had been shipped from Yorba Linda, California.[90] After finding the package, officers interviewed Dormer, who explained that he had been riding with some friends down Hamorton Street, and they were supposed to be looking for a house on Hamorton, and they were supposed to be meeting with a white guy named Jeff.[91] Jeffrey Lewis was white.[92]

Additional testimony showed that Dormer had no legitimate source of income during the time period he was associated with the conspiracy. In particular, Detective Packer found that Dormer had leased the Cadillac Escalade from a company in Santa Monica, California, and had listed his occupation as an auto detailer on the lease.[93] Packer was unable to corroborate Dormer's claimed employment and was never able to document a legitimate source of income for Dormer during his investigation.[94] On this lease application, Dormer claimed he worked at Network Systems Industries, 2643 Crenshaw Boulevard, in Los Angeles, and represented that he

---

[88]*Id.* at 1437.

[89]*Id.* at 1437-39, 1450-51, 1461.

[90]*Id.* at 1448.

[91]*Id.* at 1454.

[92]*Id.* at 1455.

[93]*Id.* at 1155-56.

[94]*Id.* at 1156, 1209.

made $5,800 per month.[95]  Packer went to this address, which was a sign-making company, and talked to the owner, who said that he did not know who Dormer was.[96]

The government also offered the testimony of Melanie Audato, who laundered drug money for her common-law husband, Clive Hamilton.[97]  Although Audato did not know Dormer personally, she testified about a conversation between her and Clive Hamilton after Hamilton's arrest on December 24, 2002.[98]  She testified that "nobody knew why" Dormer reported that his Escalade had been stolen, and that it did not "make[] sense to anybody."[99]  She further explained, "I mean, being that Dean knows what everybody's doing, why would he call the police when—I mean, he knew who he leased the car to. I mean, that was kind of silly on his behalf."[100]  Audato also testified, based on her conversations with Clive Hamilton, that Dormer "knew what [Diaz] was doing, what everybody was doing."[101]

## III.    Discussion

Dormer argues that he was denied effective assistance of counsel because his attorney had no legitimate strategic reason for questioning Adauto and because with a reasonable probability, the Court would have granted the motion to sever had the motion and been renewed. The Court discusses each claim in turn.

---

[95]*Id*. at 1207-08.

[96]*Id*. at 1208-09.

[97]*Id*. at 478-81.

[98]*Id*. at 579-80.

[99]*Id*. at 579.

[100]*Id*. at 774-75.

[101]*Id*. at 805-06.

*Standards*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."[102]  A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v. Washington*.[103]  First, a defendant must show that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness."[104]  To meet this first prong, a defendant must demonstrate that the omissions of his counsel fell "outside the wide range of professionally competent assistance."[105]  This standard is "highly demanding."[106]  Strategic or tactical decisions on the part of counsel are presumed correct, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy."[107]  In all events, judicial scrutiny of the adequacy of attorney performance must be strongly deferential: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[108]  Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error; "every effort should be made to 'eliminate the distorting effects of hindsight.'"[109]

---

[102]U.S. Const. amend. VI; *Kansas v. Ventris*, — U.S.—, 129 S. Ct. 1841 (2009).

[103]466 U.S. 668 (1984).

[104]*Id*. at 688.

[105]*Id*. at 690.

[106]*Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

[107]*Fox v.Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and citations omitted).

[108]*Strickland*, 466 U.S. at 689.

[109]*Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).

Second, a defendant must also show that his counsel's deficient performance actually prejudiced his defense.[110]  To prevail on this prong, a defendant "must show there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different."[111]  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."[112]  This, in turn, requires the court to focus on "the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair."[113]  A defendant must demonstrate both *Strickland* prongs to establish a claim of ineffective assistance of counsel, and a failure to prove either one is dispositive.[114]

A.     **Cross-examination of Adauto**

Dormer argues that his counsel's decision to cross-examine Adauto fell outside professional norms and resulted in prejudice. Counsel's cross-examination of Adauto included the following exchange relating to why Dormer would call the police to report that the Escalade had been stolen:

> Q. [Mr. Mr. Jackson] Did Rocky know who Dean [Dormer]
>
> was?
>
> A. [Audato] Yes.

---

[110]*Strickland*, 466 U.S. at 687.

[111]*Id*. at 694.

[112]*Id*.

[113]*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

[114]*Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) (quoting *Strickland*, 466 U.S. at 697) ("The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'"); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.").

Q. Because he had leased the car–Rocky being Brian

Diaz–because he had leased the car from Dean, correct?

A. Correct.

Q. You testified on direct that it didn't make any sense to

anybody. What was that a reference to?

A. **I mean, being that Dean knows what everybody's**

**doing, why would he call the police when–I mean, he**

**knew who he leased the car to. I mean, that was kind**

**of silly on his behalf.**

Q. Yes. Well, doesn't that lead you to the conclusion that he

didn't know what was going on?

A. No, it doesn't.

Q. Okay. But you had never heard of him, correct?

A. Not up until that point, no.[115]

Dormer contends that the government called Aduato as a witness against Hamilton and

that her initial testimony did not contain evidence damaging to Dormer.[116]  Thus, Dormer

contends that his attorney lacked any strategic justification for cross-examining Adauto.

Dormer concedes that an attorney's choice of questions to a witness is a tactical decision

and presumptively reasonable.  He attempts to distinguish his claim by arguing that no strategic

---

[115]Tr. Jury Trial at 774-75 (emphasis added).

[116](Doc. 964 at 13).

reason existed for asking Adauto *any* questions.[117]  Dormer fails to cite any legal authority

distinguishing the decision to cross-examine a witness from tactical decisions such as deciding

not to cross-examine a witness, deciding what questions to use in cross-examining a witness, and

whether to call a witness.[118]  If an attorney is presumed reasonable in his decision not to cross-

examine a witness and what questions to use if he does cross-examine a witness, it follows that

he similarly is protected if he decides to engage in cross-examination.  Dormer's attempt to

distinguish his attorney's decision to cross-examine Adauto as outside the realm of tactical

choices is unpersuasive.

Further, the record does not indicate, nor has Dormer demonstrated, that his attorney's

cross-examination of Adauto arose out of a lack of preparation rather than strategy.  Adauto had

testified that the conspirators questioned Dormer's reporting of the car as stolen and that Diaz

had leased the car from Dormer.  Therefore, his attorney's decision to clarify Adauto's remark

that Dormer's reporting the vehicle as stolen didn't make sense to anyone, was likely strategic.

The fact that the answer hindered Dormer's case, does not warrant a finding of ineffective

assistance.[119]  The decision to engage Adauto in cross-examination was presumptively

reasonable, and the Court sees no reason not to follow the presumption.

As Dormer has not demonstrated that counsel's conduct fell outside the scope of

professional conduct, there is no need to review whether the Court, jury, or Tenth Circuit would

---

[117](Doc 970 at 5.)

[118]*See, e.g.*, *United States v. Pena*, 920 F.2d 1509, 1520 (10th Cir. 1990) (stating that failing to cross-examine a witness constitutes a strategic choice); *United States v. Snyder*, 787 F.2d 1429, 1432 (10th Cir. 1986) (stating that counsel's choice of cross-examination questions is a tactical decision); *United States v. Miller*, 643 F.2d 713, 714 (10th Cir. 1981) (stating that whether to call a witness is a tactical decision).

[119]*See Strickland*, 466 U.S. at 689.

have altered its conclusion in absence of Adauto's testimony.[120]  However, because Dormer

strongly contends that the Tenth Circuit would not have upheld the conviction absent Adauto's

solicited testimony, the Court will address the second *Strickland* prong.

Dormer contends that the Tenth Circuit was "weary" of finding the other evidence

presented against Dormer sufficient and relied heavily on the solicited testimony of Adauto to

uphold the conviction.  Dormer focuses on this passage from the court's decision:

> While Diaz and Gayle were using the Escalade to collect Barker's
> drug proceeds, Dormer reported it stolen.  Although this evidence
> could lead a jury to reasonably infer Dormer did not know what
> members of the conspiracy were doing, an equally reasonable
> inference is that Dormer did know what other members of the
> conspiracy were doing, just not on that particular day.  **His and
> Walton's conduct after learning the Escalade was recovered at
> the Van Nuys airport, i.e., attempting to call of the police, is
> particularly damning.  It demonstrates Dormer was familiar
> with the workings of the Barker conspiracy, in particular, that
> it transported its marijuana in airplanes.**  This inference is
> supported by Adauto's testimony that no one knew why Dormer
> filed the stolen vehicle report "being that [Dormer] knows what
> everybody's doing . . . . I mean, he knew who he leased the car to.
> I mean, that was kind of silly on his behalf." She later reiterated
> that based on her conversations with Clive, she understood
> "[Dormer] knew what Rocky was doing.  What everybody was
> doing."[121]

Thus, Dormer posits, "but for" Adauto's testimony, the only connection between Dormer and the

illegal activities of the Barker conspiracy was when he reported the Escalade stolen.

The Court disagrees.  While the Tenth Circuit did mention Adauto's solicited testimony,

a holistic reading of the opinion demonstrates that the Tenth Circuit's conclusion did not

characterize her testimony as the lynch pin that upheld the conviction.  In fact, in reaching its

---

[120]*See Smith,* 528 U.S. at 286 n.14.

[121]*United States v. Dormer,* No. 06-3310, at 23-24 (10th Cir. Nov. 21, 2008).

conclusion, the court placed weight on the inference created by Dormer and Walton's attempt to "unreport" the theft of the Escalade, which was supported by Adauto's testimony.[122]

Moreover, the Tenth Circuit also relied on Dormer's relationship with Faeth Hamilton, Diaz taking over payments on the vehicle, conversations Dormer was involved in discussing "Arizona," Dormer's connection with a UPS package, and Dormer's purchase of two homes with no legitimate sources of income as evidence of his involvement in the conspiracy.[123] Additionally, the Tenth Circuit found that other evidence, namely Dormer's involvement with Faeth Hamilton, supported that Dormer was an interdependent component of the conspiracy. Similarly, Adauto's testimony prior to the challenged cross-examination indicated that Dormer had leased the car to Diaz, and it was a common practice of the conspiracy to lease vehicles in differing names to avoid government forfeiture. This evidence also demonstrates that Dormer was an interdependent component of the conspiracy. As the Tenth Circuit concluded, Dormer was "simply concocting inferences from the evidence supporting his innocence," and failed "to refute the reasonable inferences of guilt arising from that same evidence."[124] Even without the solicited testimony from Adauto there is not a reasonable probability that the Tenth Circuit would have overturned the conviction. Thus, the solicited testimony was a reasonable strategic choice and did not prejudice Dormer.

### B. Failure to Renew the Motion to Sever

Dormer next argues that he was denied effective assistance of counsel because his

---

[122]*Id.*

[123]*Id.* at 24-26.

[124]*Id.* at 26-27.

attorney failed to renew the motion to sever, which the Court denied without prejudice.[125]

Dormer contends that had his counsel renewed the motion to sever after the Court saw the

relatively small amount of evidence presented against him, it would have, with reasonably

probability, granted severance.[126]  When a claim of ineffective assistance of counsel is brought

because of the failure to raise an issue, courts consider the merits of the issue itself.[127]  If the

omitted issue is meritless, then the defendant has not met his burden to prove the error was

prejudicial.  Additionally, failure to raise a meritless issue does not constitute deficient

performance.[128]

A court should grant a motion for severance when a joint trial prevents the jury from

making a sound determination or comprises a right of one of the defendants.[129]  When defendants

are indicted together, the preference is for them to be tried together.[130]  In order to warrant a

severance, the defendant must demonstrate real prejudice.[131]  Real prejudice requires more than

showing that the defendant's chances of acquittal would be greater in a separate trial.[132]  The risk

of prejudice is heightened when many defendants with "markedly different degrees of

---

[125](Doc. 964 at 17.)

[126](Doc. 964 at 18-19.)

[127]*United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006).

[128]*Sperry v. McKune*, 445 F.3d 1268, 1275 (10th Cir. 2006) (stating that if an issue is meritless, not raising the issue is not deficient performance); *see also Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004) (stating that when an issue has some merit but is not compelling, counsel's decision not to raise the issue is given deference by the court).

[129]*United States v. Youngpeter*, 986 F.2d 349, 353 (10th Cir. 1993).

[130]*United States v. Wardell*, 591 F.3d 1279, 1299 (10th Cir. 2009).

[131]*Youngpeter*, 986 F.20 at 353.

[132]*Id.*

culpability" are tried together.[133]  However, a mere "spillover" of negative evidence presented

against a co-defendant is insufficient to warrant a severed trial.[134]  The Tenth Circuit has

developed a "nearly insuperable" rule against granting severance because of varying levels of

evidence against co-defendants.[135]  However, defendants may be entitled to severance if evidence

inadmissable against the defendant is presented in a joint trial.[136]  A court weighs potential

prejudice against the expense and inefficiency of separate trials.[137]  District courts can limit the

risk of prejudice by taking remedying measures, such as limiting jury instructions.[138]

Dormer argues that the difference in degrees of culpability between Hamilton and

himself warranted a severed trial.  Although the government did present a greater volume of

evidence against Hamilton, the limiting instructions given to the jury sufficiently overcame any

prejudice.[139]  Specifically, the Court instructed the jury, "It is your duty to give separate

consideration to the evidence as it pertains to each defendant and return a separate verdict for

each defendant.  The fact that you find any one defendant guilty or not guilty of the crime

charged should not control you verdict as to any other defendant."[140]  Similarly, the Court

instructed that "[p]roof that people simply met together from time to time and talked about

---

[133]*Zafiro v. United States*, 506 U.S. 534, 539 (1993).

[134]*United States v. Hack*, 782 F.3d 862, 870 (10th Cir. 1986).

[135]*Wardell*, 591 F.3d at 1300.

[136]*Zafiro*, 506 U.S. at 539.

[137]*Id.*

[138]*Id.*

[139]*Id.*

[140]Doc. 491, Instruction No. 8.

common interests, or acted in a similar way, is not enough to establish a criminal agreement";[141] and "the mere fact that certain persons have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of a conspiracy."[142]

Dormer's statement that limiting instructions do not remove all prejudice is insufficient to overcome the strong preference of trying alleged conspirators together.[143] Additionally, the government correctly argues that Dormer essentially contends that the evidence against Hamilton spilled over to Dormer. The Tenth Circuit has repeatedly held that a spill over of evidence presented against one defendant does not justify severance.[144] Therefore, the disparate levels of evidence and culpability were not enough for the Court to have granted a motion to sever. Had Dormer's counsel renewed his motion, the Court would have denied it, thus his failure to renew the motion to sever was not prejudicial.

Dormer further argues that had the defendants been tried separately the government would not have called Adauto as a witness. Although a severance may be warranted if evidence inadmissible against one defendant is present, Dormer has not shown that the government could not have called Adauto as a witness had Dormer been tried separately.[145] Dormer's argument is purely speculative. The Tenth Circuit has rejected speculative arguments as insufficient to meet

---

[141]*Id.*, Instruction No. 14.

[142]*Id.*

[143]*See Youngpeter*, 986 F.2d at 353.

[144]*See, e.g.*, *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005); *United States v. Cardall*, 885 F.3d 656, 668 (10th Cir. 1989); *United States v. Hack*, 782 F.2d 862, 870 (10th Cir. 1986).

[145]*See Zafiro*, 506 U.S. at 539 (stating the **inadmissibility** of evidence against a defendant may warrant severance) (emphasis added).

a defendant's burden to show prejudice.[146]   While Dormer speculates that the government would have had no reason to call Adauto he does not contend that the government could not have called Adauto, such a speculation is insufficient to show that the Court would have severed the trial had the motion to sever been renewed.   Given that the Court would not have granted a motion to sever had Dormer's counsel renewed the motion, counsel's failure to reassert severance was not prejudicial.

## IV . Certificate of Appealability

Effective December 1, 2009, Rule 11 of the Rules Governing Section 2255 Proceedings requires the Court to grant or deny a certificate of appealability ("COA") when making a ruling adverse to the petitioner.   "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[147]   A petitioner may satisfy his burden only if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[148]   A petitioner is not required to demonstrate that his appeal will succeed to be entitled to a COA.   He must, however, "prove something more than the absence of frivolity or the existence of mere good faith."[149]   "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims.   In fact,

---

[146]*See, e.g. Boyle v. McKune*, 544 F.3d 1132, 1139-40 (10th Cir. 2008) (rejecting defendant's argument that had a witness been called that he would have been acquitted as speculative); *Cummings v. Sirmons*, 506 F.3d 12111, 1129 (10th Cir. 2007) (rejecting speculative arguments about other evidence in an ineffective assistance of counsel challenge).

[147]28 U.S.C. § 2253(c)(2).   The denial of a § 2255 motion is not appealable unless a circuit justice or a circuit or district judge issues a certificate of appealability.   *See* Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c)(1).

[148]*Saiz v. Ortiz*, 393 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke*, 524 U.S. 274, 282 (2004)).

[149]*Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).

the statute forbids it."[150]  For the reasons detailed in this Memorandum and Order, Dormer has

not made a substantial showing of the denial of a constitutional right, and the Court denies a

COA as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Dormer's Motion to Vacate

pursuant to 28 U.S.C. § 2255 (Doc. 951) is DENIED; Dormer is also denied a COA.

**IT IS FURTHER ORDERED THAT** Dormer's Motion for Leave to Proceed In Forma

Pauperis (Doc. 952) denied as moot.

**IT IS SO ORDERED.**

Dated: <u>March 2, 2011</u>

 S/ Julie A. Robinson 
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[150]*Id.* at 336; *see also United States v. Silva*, 430 F.3d 1096, 1100 (10th Cir. 2005).